# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Suzanne M. McCole | : | Case No. 1:14CV1037 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | **MEMORANDUM AND** |
| Carolyn W. Colvin, | : | **ORDER** |
| Acting Commissioner of Social | : | |
| Security | : | |
| | : | |
| Defendant, | : | |
| | : | |

## I. INTRODUCTION

Plaintiff Suzanne M. McCole ("Plaintiff") seeks judicial review of a final decision of the Commissioner denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), as set forth in 42 U.S.C. §§ 416(i), 423, 1381, *et. seq*., and § 405(g).  The parties have consented to the Magistrate entering final judgment in this case pursuant to 28 U.S.C. § 636(c)(1) and FED. R. CIV. P. 73 (Docket No. 14).  Pending are briefs on the merits filed by both parties (Docket Nos. 16 & 18), and Plaintiff's Reply (Docket No. 19).  For the reasons set forth below, the Magistrate reverses the Commissioner's decision and remands this case for further proceedings consistent with this Memorandum and Order.

1

## II. PROCEDURAL BACKGROUND

On June 14, 2011, Plaintiff filed both her applications for DIB and SSI, alleging disability beginning April 15, 2005 (Docket No. 12, pp. 211-223 of 585).  Plaintiff's claims for both DIB and SSI were denied on August 13, 2011, and upon reconsideration on November 15, 2011 (Docket No. 12, pp. 130-135; 139-144 of 585).[1]  Plaintiff filed a written request for a hearing on December 14, 2011 (Docket No. 12, p. 145 of 585).  On September 27, 2012, a hearing commenced in Cleveland, Ohio, before Administrative Law Judge (ALJ) Alfred V. Lucas, at which Plaintiff, represented by her counsel Andrew November, Medical Expert (ME) Dr. Daniel Schweid, and Vocational Expert (VE) Mark Anderson were present and testified (Docket No. 12, pp. 37; 14 of 585).  During the hearing, Plaintiff's onset of disability date was amended to June 17, 2010 and Plaintiff's prior application for disability denied on December 22, 2010 was reopened (Docket No. 12, pp. 37-38; 14 of 585).  The ALJ issued an unfavorable decision on January 17, 2013 (Docket No. 12, pp. 14-23 of 585).  The Appeals Council denied review of the ALJ's decision on March 14, 2014, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 585).

## III.  FACTUAL BACKGROUND

**A.    ADMINISTRATIVE HEARING**

**1.    PLAINTIFF'S TESTIMONY**

Plaintiff testified that she is 51 years old, lives alone, and does not have a car or driver's license (Docket No. 12, pp. 39-40 of 585).  Plaintiff attended school until the eleventh grade, obtained her GED in 1987, and last worked in 2008 (Docket No. 12, p. 40 of 585).  She detailed her past employment, including hotel, restaurant, and cleaning work (Docket No. 12, pp. 40-42 of 585).  According to Plaintiff, the most she would have lifted at these

---

[1] The record also includes a previously filed application for DIB on June 23, 2010, alleging disability on April 15, 2005, which was denied on December 29, 2010  (Docket No. 12, pp. 209-210; 127-129 of 585).

jobs was approximately ten pounds (Docket No. 12, p. 42 of 585).

Next, Plaintiff detailed her medical history, testifying that she is under the care of Dr. Hofius, whom she sees twice a year and that she previously underwent chest surgery to address an issue involving fluid around her heart (Docket No. 12, pp. 42-43 of 585). For her physical complaints, Plaintiff takes Lipitor and Advair (Docket No. 12, pp. 43-44 of 585). Plaintiff also takes Zoloft, Risperidone, Latuda, and Elavil medications for her mental and emotional issues (Docket No. 12, pp. 44-45 of 585). She described side effects from these medications including nausea, loss of appetite, weight gain, and drowsiness (Docket No. 12, pp. 44-45 of 585). Plaintiff formally treated with Megan Boogaart for her mental and emotional issues, but now sees "Kristen" every three weeks at Neighboring Mental Health Services and a therapist once a month (Docket No. 12, p. 44 of 585).

Plaintiff testified that she experiences throbbing pain in her right hand, stemming from a fracture of her wrist and knuckles that occurred six months earlier (Docket No. 12, pp. 45-46 of 585). Over the past year, Plaintiff has received treatment at the hospital for chest pains, which occur when she suffers a panic attack (Docket No. 12, p. 47 of 585). Plaintiff also suffers from shortness of breath caused by overexertion during activities such as walking or cleaning and by exposure to extreme heat or cold (Docket No. 12, pp. 47-48 of 585). Despite being urged to quit smoking by her doctors, Plaintiff indicated that she still smokes a half pack of cigarettes a day (Docket No. 12, p. 48 of 585). Plaintiff estimated that she is capable of standing between five and ten minutes and walking for a distance of approximately two and a half blocks before needing to sit down and rest (Docket No. 12, p. 49 of 585). Plaintiff testified that she is able to sit, use stairs, bend over and touch the floor, and squat down by bending her knees (Docket No. 12, p. 49 of 585). Plaintiff opined that she could lift approximately five pounds (Docket No. 12, p. 50 of 585).

Plaintiff detailed her history of anxiety and depression, noting that she has been suffering from both since 2007 (Docket No. 12, pp. 50; 52 of 585). She explained that she is nervous all of the time, which is triggered by

3

being around people (Docket No. 12, p. 50 of 585).  Plaintiff estimated that she suffers as many as two panic attacks a week, which usually last a few minutes, and include symptoms such as chest pain, shortness of breath, and feeling sweaty and faint (Docket No. 12, p. 51 of 585).  To relieve her symptoms, Plaintiff sits down and breathes into a bag (Docket No. 12, p. 51 of 585).  Plaintiff also cries frequently and continuously for all but two hours a day (Docket No. 12, p. 52 of 585).  She indicated that she gets along with other people, but that her mental problems affect her ability to concentrate during activities such as reading, watching television, and cooking (Docket No. 12, pp. 52-53 of 585).  Plaintiff testified that her emotional problems have also adversely affected her memory, specifically with respect to dates and times (Docket No. 12, p. 53 of 585).  With respect to her activities of daily living, Plaintiff indicated that she does not cook, clean, do her own laundry or grocery shop, relying instead on friends to complete these tasks (Docket No. 12, pp. 53-54 of 585).  Plaintiff estimated that she leaves her house once a week, seldom watches television, and does not read (Docket No. 12, pp. 54-55 of 585).  She receives $115 in welfare, food stamps, and has a medical card (Docket No. 12, p. 55 of 585).

During examination by her attorney, Plaintiff indicated that she has experienced a loss of interest in former activities,  such as exercising, walking, dancing and cooking (Docket No. 12, p. 55 of 585).  In addition to suffering from crying spells, Plaintiff added that she has difficulty sleeping, hears voices, has little energy and usually spends her days in bed or on the sofa looking out the window (Docket No. 12, pp. 56-57 of 585).  Plaintiff also complained that she experiences thoughts of helplessness, guilt, and worthlessness.  She avoids people, going outside, and does not always shower or change her clothes (Docket No. 12, pp. 57-58 of 585).

## 2.    MEDICAL EXPERT'S TESTIMONY

The ME summarized the medical information, detailing Plaintiff's history of Schizoaffective Disorder, alcohol abuse and dependence, and an old history of IV drug abuse (Docket No. 12, pp. 58-59 of 585).  The ME also summarized Plaintiff's treatment at Neighboring Mental Health Services and Tripoint Medical Center (Docket

No. 12, pp. 59-61 of 585).  In discussing Plaintiff's exertional limitations, the ME opined that Plaintiff had a limitation on repetitive movements of her right hand (Docket No. 12, p. 61 of 585).  If the ALJ attributed any validity to Plaintiff's subjective pulmonary symptoms, the ME explained that limitations restricting Plaintiff from exposure to any pollutants such as toxic fumes, dusts, heavy dusts or heavy agricultural pollens, extremes of temperature, and humidity would be appropriate (Docket No. 12, pp. 61-62 of 585).  Furthermore, the ME opined that Plaintiff should be restricted from unprotected heights, dangerous or unprotected machinery and driving a motor vehicle, citing her history of substance abuse and relapse (Docket No. 12, p. 62 of 585).  Next, the ME addressed Plaintiff's non-exertional limitations, opining that Plaintiff would be limited to routine, low stress tasks, involving no arbitration, negotiation, confrontation, managerial or supervisory work, noting that Plaintiff should not be responsible for the safety or health of others and should be excluded from work where there are high or strict production quotas (Docket No. 12, p. 62 of 585).

In addressing Plaintiff's case record, the ME also testified that he disagreed with the severity of limitations assessed by Dr. Marton and Ms. Boogaart.  The ME opined that the limitations assessed by Dr. Marton and Ms. Boogaart were overstated based on the record.  Rather than marked or extreme limitations as they had assessed, the ME noted that in his opinion, Plaintiff suffers only moderate limitations in understanding, remembering, carrying out instructions, using judgment, and handling complex situations and supervision (Docket No. 12, pp. 62-63 of 585). With respect to arbitration and confrontational work, the ME also opined that Plaintiff should be restricted from intense interaction (Docket No. 12, p. 63 of 585).

During cross-examination by Plaintiff's counsel, the ME conceded that it was arguable whether Plaintiff would be able to work a normal workday and work week on a sustained basis given her impairments, but maintained that he believed Plaintiff's impairments were more likely moderate and less severe than what Ms. Boogaart and Dr. Marton had assessed (Docket No. 12, pp. 63-64 of 585).  The ME next confirmed for Plaintiff's counsel that the

5

record included evidence of hallucinations, delusions, paranoia, sleep disturbance, decreased energy and feelings

of guilt or worthlessness (Docket No. 12, pp. 65-66 of 585).  Finally, the ME opined, with respect to his opinions

of Plaintiff under the "B" criteria for listing 12.04 that Plaintiff's capabilities for activities of daily living, social

functioning, concentration, persistence and pace are moderately impaired (Docket No. 12, pp. 67-68 of 585).

### 3.   VOCATIONAL EXPERT'S TESTIMONY

The VE characterized Plaintiff's past work history as cleaner, DOT[2] 323.687-014, which is listed and

performed at a light exertion level, is unskilled work, and has a specific vocational preparation (SVP)[3] of 2;

waitress, DOT 311.477-030, listed and performed at a light exertion level, is semi-skilled work, with a SVP of 3;

and kitchen helper, DOT 317-687-010, listed at a medium exertion level, but performed by Plaintiff at a light

exertion level, is unskilled work, with a SVP of 2 (Docket No. 12, pp. 68-69 of 585).

The ALJ then asked his first hypothetical question:

> Assume we're discussing a person of the same age, education and work background and this person
> is impaired to the extent the Claimant testified, would there be jobs which exist in significant
> numbers in the economy that this person could do?

(Docket No. 12, p. 69 of 585).  After considering the hypothetical, the VE testified that there would be no such jobs,

reasoning that the Plaintiff's testimony about her lifting restrictions, crying spells, problems leaving the house and

difficulties with concentration would preclude her from work (Docket No. 12, p. 69 of 585).  The ALJ then asked

his second hypothetical question:

> Assume we're discussing a person of the same age, education and work background and that this
> person has no specific exertional limitations, but nonexertionally, this person could not perform

---

[2] Dictionary of Occupational Titles ("DOT")

[3] SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

work requiring rapid, repetitive use of the dominant right hand and she should avoid concentrated pollutants such as dust, smoke, fumes, unprotected heights, dangerous machinery, or driving commercially.  She would be limited to routine, low stress work, with no intense interaction with other people such as arbitration, confrontational work, negotiation, supervision, or responsibility for the health and safety of others and she would require a job where there would be no high or strict production quotas.  With those limitations, would there be jobs which exist in significant numbers in the economy that this person could do?

(Docket No. 12, pp. 69-70 of 585).  The VE responded affirmatively to the ALJ's hypothetical, offering examples of other work including laundry laborer, DOT 361.687-018, listed at a medium exertion level, which is unskilled work, having at least 180,000 such jobs in the nation, 30,000 in the State of Ohio, and 4,500 in Northeast Ohio; inspector and hand packager, DOT 559.687-074, listed at a light exertion level, which is unskilled work, having at least 235,000 jobs in the nation, 22,500 in the State of Ohio, and 4,500 in Northeast Ohio and filling and closing machine tender, DOT 529.685-282, listed at a light level of exertion, which is unskilled work, having 185,000 jobs in the nation, 15,000 in the State of Ohio, and 3,000 in Northeast Ohio (Docket No. 12, p. 70 of 585).  Even if the hypothetical person has a problem with the dominant hand and cannot perform work requiring rapid, repetitive use of the hand, the VE explained that the inspector and hand packager position would not be impacted because the position can be performed with one extremity (Docket No. 12, pp. 70-71 of 585).

The ALJ then presented his third hypothetical question:

Assume we're discussing a person of the same age, education and work background.  This person also has no specific exertional limitations but would be limited to work in which she would not be exposed to concentrated exposure to odors, dusts, gases, and other pollutants, extremes of temperature or high humidity.  Assume that this person also is limited to work where . . . she would not be able to perform jobs requiring rapid repetitive use of the dominant right hand.  Assume that this person would be limited to simple, repetitive tasks, with only superficial interaction with other people, not requiring work that would . . . be limited to low stress in nature without frequent changes in the work duties.  Would there be jobs which exist in significant numbers in the economy that this person could do?

(Docket No. 12, p. 71 of 585).  The VE opined that the laundry laborer and machine tending positions would be eliminated, but the inspector and hand packager position would not be affected (Docket No. 12, pp. 71-72 of 585).

7

The VE provided two other jobs to replace the eliminated positions: injection molding machine tender, DOT 556.685-038, unskilled work, with a light exertion level, having 210,000 jobs in the nation, 18,000 in the State of Ohio, and 5,300 in Northeast Ohio and; flow molding machine tender, DOT 556.685-086, listed at a light level of exertion, unskilled work, and having 158,000 jobs in the nation, 15,000 in the State of Ohio, and 3,000 in Northeast Ohio (Docket No. 12, pp. 71-72 of 585).  Revisiting the second hypothetical, the ALJ clarified with the VE whether being subjected to high humidity would eliminate all the other jobs the VE provided in response to the ALJ's second hypothetical question (Docket No. 12, pp. 72-73 of 585).  The VE responded that due to the high humidity in the laundry labor position that all but the inspector and hand packager position would be eliminated (Docket No. 12, pp. 72-73 of 585).

## B.    MEDICAL RECORDS

Summaries of Plaintiff's medical records, to the extent necessary and relevant to the issues before this Court, follow.

### 1.    NEIGHBORING MENTAL HEALTH SERVICES

#### a.    TREATMENT RECORDS

Plaintiff received treatment from Katherine Proehl, ND,[4] APRN,[5] BC,[6] on nine occasions between August 10, 2009 and December 8, 2009.  Ms. Proehl's diagnoses for Plaintiff included Major Depressive Disorder (MDD),

---

[4] Doctor of Nursing (ND).

[5] Advanced Practice Registered Nurse (APRN).

[6] Board Certified (BC).

recurrent, and ETOH dependence.  Plaintiff's medications are listed as Seroquel,[7] Zoloft,[8] and Trazodone[9] (Docket No. 12, pp. 337-354 of 585).

From May 27, 2010 through March 16, 2012, Plaintiff also received treatment from Megan Boogaart, ND, FNP on 22 occasions.  Ms. Boogaart's most recent diagnoses for Plaintiff included Schizoaffective - depressed, ETOH dependence, and she assessed Plaintiff a global assessment of functioning (GAF)[10] score of between 50 and 55.  Plaintiff's medications included Saphris, Risperdal, Zoloft, Lovaza (omega 3), and vitamin D (Docket No. 12, pp. 451-458; 413-416; 367-382; 355-364; 335-336; 445-446 of 585).

Plaintiff also received counseling services from Neighboring Mental Health Services.  Between July 28, 2011 and July 24, 2012, Plaintiff met with Jenny Row, MSSA, LISW on 11 occasions, Renee Molzon, LSW on 11 occasions, and Mary Jane Ruttinger, RN on one occasion (Docket No. 12, pp. 537-556; 558-585 of 585).

### b.    PSYCHIATRIC EVALUATION - KATHERINE PROEHL, ND, APRN, BC

On June 26, 2009, Plaintiff underwent a psychiatric evaluation and complained of having difficulty sleeping,

---

[7] Seroquel is prescribed to treat certain mental/mood disorders. *Seroquel oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 2:45 PM), http://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details.

[8] Zoloft is prescribed to treat depression and panic attacks, among other disorders. *Zoloft oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 2:47 PM), http://www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/details.

[9] Trazodone is prescribed to treat depression and improve mood, appetite, and energy levels. *Trazodone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 30, 2014, 2:49 PM), http://www.webmd.com/drugs/2/drug-11188-89/trazodone-oral/trazodone-oral/details.

[10] "The Global Assessment of Functioning (GAF) Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. . . . A GAF of 50 o[r] lower indicates 'serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g., no friends, inability to keep job)'. . . . A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Turner v. Astrue*, 2009 WL 5171814, at *3 (D. Neb. 2009)(citing *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Am. Psychiatric Ass'n, 4th ed. 2000)).

homelessness for the past year, depression, and panic attacks among other symptoms. The evaluation report details Plaintiff's psychiatric, family, legal, and medical history. Plaintiff's diagnoses included Major Depression, recurrent, Alcohol Dependence, active, and that Plaintiff was assessed a GAF score of 48 (Docket No. 12, pp. 383-385 of 585).

### c.   DAILY ACTIVITIES QUESTIONNAIRE - RENEE R. MOLZON, LSW

On July 25, 2011, Ms. Molzon completed a Daily Activities Questionnaire for Plaintiff, which indicates that she first saw Plaintiff on May 24, 2010 and last saw Plaintiff on July 12, 2011. The questionnaire reflects that Plaintiff lives in a subsidized apartment alone, and that Plaintiff gets along well with others unless she feels that she is threatened or being discussed. Ms. Molzon indicated that Plaintiff visits with her family once a year, her friends once a week, and her therapist twice a week. Next, Ms. Molzon opined that Plaintiff's depression makes it difficult for her to get out of bed, that she has poor social skills, and fears leaving the house on many occasions, citing paranoia, and uncontrolled crying spells. Plaintiff's legal difficulties are also detailed and consist of disorderly conduct and trespassing due to homelessness. The form also notes that Plaintiff prepares a few meals per week, cleans her house weekly, but does not bathe or dress all of the time, often staying in her pajamas for days and requiring others to shop for her. Ms. Molzon's comments reflect that Plaintiff sometimes uses the bus for transportation, does not bank or pay bills, and her only hobby is watching television. Ms. Molzon noted that Plaintiff is seen at least every one to two weeks and keeps every other appointment. It was also noted that Plaintiff has medication management, community psychiatrist supportive treatment (CPST), and evaluation counseling (Docket No. 12, pp. 388-389 of 585).

### d.   MEDICAL SOURCE STATEMENT - MEGAN BOOGAART WITH DR. RUTH MARTON, M.D.

On March 28, 2012, Ms. Boogaart and Dr. Marton completed a Medical Source Statement together for Plaintiff, which is dated March 28, 2012 and opines that Plaintiff has mild limitations in understanding and

remembering simple instructions, and making judgments on simple work-related decisions.  Ms. Boogaart and Dr. Marton assessed Plaintiff marked limitations in understanding and remembering complex instructions, carrying out complex instructions and making judgments on complex work-related decisions.  To support these limitations, it is noted that Plaintiff has some memory issues, notable psychosis, severe depression/anxiety, and Schizoaffective Disorder.  Ms. Boogaart and Dr. Marton also assessed Plaintiff mild limitations for interacting appropriately with the public and co-workers, a marked limitation for interacting appropriately with supervisor(s), and an extreme limitation for responding appropriately to usual work situations and changes in a routine work setting.  The limitations are supported by a notation that Plaintiff has Schizoaffective Disorder, Psychosis, and severe Depression. The statement also indicates that Plaintiff sometimes has difficulty distinguishing reality from psychosis symptoms, explaining that Plaintiff hears voices, has visual hallucinations at times, difficulty remembering medication instruction/education and cognitive difficulties that are unclear at this time.  Plaintiff's limitations were first noted as occurring years ago.  In response to whether Plaintiff's impairments are affected by alcohol or substance abuse, it is noted that Plaintiff has a history of alcohol abuse, but it is not her primary diagnosis, but may have contributed to her cognitive issues, and her alcohol abuse is in partial remission (Docket No. 12, pp. 461-463 of 585).

2.    DAN HOFIUS, D.O.

A medical questionnaire dated October 24, 2011 and signed by Daniel Hofius, D.O., refers to attached notes (Docket No. 12, pp. 392-394 of 585).  A progress note dated September 21, 2011, reflects that Plaintiff presented for a physical and had experienced some heaviness in her chest.  Plaintiff underwent lab testing for her chest paints, a pulmonary function test was ordered to assess chronic obstructive pulmonary (COPD).  Plaintiff was started on Vigamox solution and given injections for influenza, Diphtheria, Tetanus, and Pertussis (Docket No. 12, pp. 395-399 of 585).  A second progress note dated August 2, 2011, reflects that Plaintiff was treated for a cough and prescribed Advair Diskus, and Omnicef for a Stye.  The record also includes lab, radiology, and echocardiogram

11

reports (Docket No. 12, pp. 400-408 of 585).

**3.    LAKE HOSPITAL SYSTEM**

- On March 1, 2009, Plaintiff presented to the Emergency Department with a left knee sprain which was confirmed by an x-ray.  Plaintiff was discharged and prescribed Naproxyn (Docket No. 12, pp. 465-471 of 585).

- On March 12, 2009, Plaintiff again presented to the Emergency Department with neck strain, left elbow sprain and contusions to her right flank, right hand, and head and face, which stemmed from an alleged assault. X-rays taken of Plaintiff's chest and hand showed a healing fracture of the fifth metacarpel and foreign body in the soft tissues of the wrist (Docket No. 12, pp. 473-480 of 585).

- On December 1, 2009, Plaintiff complained of right-sided chest pain since the previous Friday.  The medical impression indicates Plaintiff had atypical pleuritic right-sided chest pain and recommended an echocardiogram, stress test, and that Plaintiff stop smoking.  The results of Plaintiff's echocardiogram showed that her left ventricle ejection fraction was 60-65%, she had mild aortic regurgitation and mild tricuspid regurgitation.  Plaintiff was discharged later on December 1 by Dr. Alexander Todorinov, M.D. (Docket No. 12, pp. 482-523 of 585).

- On October 27, 2011, Plaintiff underwent a spirometry study with Dr. Gary Kaplan, M.D.  Plaintiff was diagnosed with COPD, but the medical impression notes that it was normal pulmonary function study (Docket No. 12, pp. 525-527 of 585).

## IV.  STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014).  At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the

claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014). If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014). While the claimant has the burden of proof in steps one through four, the Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted). If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014). If an adjustment cannot be made then the claimant is disabled. *Id.*

13

### V. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Lucas made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through September 30, 2007.

2. Plaintiff has not engaged in substantial gainful activity since June 17, 2010, the alleged onset date.

3. Plaintiff has the following severe impairments: schizoaffective disorder, substance abuse, and chronic pulmonary insufficiency.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, ALJ Lucas found that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: could not perform work requiring rapid, repetitive use of the dominant right hand; should avoid concentrated pollutants such as dust, smoke, fumes, extremes of temperature and high humidity; should avoid unprotected heights, dangerous machinery, or driving commercially; limited to routine low stress work with no intense interaction with other people such as arbitration, confrontational work, negotiation, supervision, or responsibility for the health and safety of others and precluded from work with high or strict production quotas.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on July 26, 1961 and was 48 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from June 17, 2010, through the date of this decision.

(Docket No. 12, pp. 16-22 of 585).

14

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  On review, this Court must affirm the Commissioner's decision unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (*quoting* 42 U.S.C. § 405(g)).  "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance."  *Miller*, (*quoting Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (*quoting Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VII.  DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ erred by failing to consider the opinions from by her case manager, Ms. Renee Molzon, in rendering Plaintiff's RFC (Docket No. 16, pp. 19-21 of 22).  In support of her assertion, Plaintiff argues

15

that the ALJ did not address Ms. Molzon's most recent Mental/Emotional Questionnaire dated June 15, 2012, and failed to include any analysis of Ms. Molzon's opinions in his decision (Docket No. 16, pp. 19-21 of 22).  Plaintiff also cites *Davila v. Comm'r of Soc. Sec.*, 993 F.Supp.2d 737, 758 (N.D. Ohio 2014), in which this Court reversed and remanded the Commissioner's decision, in relevant part, because the ALJ failed to provide an adequate explanation for assigning the opinions of two nurse practitioners, little weight.  *Id.* at 757-758.

B.    **DEFENDANT'S ALLEGATIONS**

Defendant disagrees and maintains that the ALJ's consideration of Ms. Molzon's other source opinion was reasonable (Docket No. 18, pp. 14-15 of 21).   Citing precedent from the Sixth and Eighth Circuits, Defendant first contends that the ALJ's failure to cite specific evidence does not indicate that the evidence was not considered (Docket No. 18, pp. 15-19 of 21).  *See Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."); *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006)("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.  Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.")(citing *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Defendant also argues that the ALJ "largely relied" on Ms. Molzon's Daily Activities Questionnaire in evaluating Plaintiff's activities of daily living, but ultimately credited the ME's testimony, assessing Plaintiff less severe limitations than opined by Ms. Molzon (Docket No. 18, pp. 16-19 of 21). Defendant asserts that such a determination is within the Commissioner's "zone of choice" (Docket No. 18, p. 19 of 21).

C.    **ANALYSIS**

1.    **THE ALJ'S DECISION DOES NOT REFLECT WHETHER ALL OF THE RELEVANT EVIDENCE WAS CONSIDERED IN RENDERING PLAINTIFF'S RFC**

16

The Commissioner is required to assess the claimant a RFC based upon all of the relevant evidence in the claimant's case record, including statements provided by the claimant's medical sources about his or her functional capabilities as well as "descriptors and observations" from the claimant, his or her family, neighbors, friends, or any other person concerning the claimant's limitations resulting from his or her impairment(s). *See* 20 C.F.R. §§ 416.945(a)(1), (a)(3), 416.912 (West 2014). These opinions are then weighed based upon the source of the opinion under criteria set forth under the Act. For example, the regulations specify that only "acceptable medical sources," which include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists, may provide evidence to establish the existence of a medically determinable impairment, provide a medical opinion, and be considered a "treating source," whose opinion may be entitled to controlling weight. 20 C.F.R. § 416.913(a) (West 2014); SSR 06-03p, 2006 WL 2329939, at *2 (West 2014). Opinions rendered from sources who do not qualify as "acceptable medical sources," are classified as opinions from "other sources, and may be used to show the severity of the claimant's impairment(s) and how it impacts the claimant's ability to work." 20 C.F.R. § 416.913(d) (West 2014).

As a licensed social worker and Plaintiff's case worker, Ms. Molzon's opinion does not qualify as that of "acceptable medical source," but is instead classified under "other sources" as an opinion rendered by a non-medical source. 20 C.F.R. § 416.913(d) (West 2014). "Rather than a presumption of controlling weight, an ALJ is vested with the discretion to determine the proper weight assigned to these other sources based on the evidence of record." *Davila v. Comm'r of Soc. Sec*., 9934 F.Supp.2d 737, 757 (N.D. Ohio 2014)(citing *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541 (6th Cir. 2007)). Social Security Regulations instruct that in weighing opinion evidence from "non-medical sources" who have seen the claimant in their professional capacity but are not "acceptable medical sources," the Commissioner should evaluate such opinions using the applicable factors set forth in 20 C.F.R. § 416.927(c)(2). SSR 06-03p, 2006 WL 2329939, at *4-5 (West 2014). Distinguishing between what an adjudicator

17

must consider and explain in rendering his or her decision, SSR 06-03p also provides:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from . . . "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6.

In this case, the ALJ's decision cites Ms. Molzon's Daily Activities Questionnaire from July 25, 2011 and to treatment notes, by exhibit number, during the ALJ's discussion of Plaintiff's RFC, but does not reference Ms. Molzon's most recent Mental/Emotional Questionnaire from June 15, 2012 and fails to include any analysis of Ms. Molzon's opinions (Docket No. 12, pp. 19; 319-320 of 585). While an ALJ is not required to cite every piece of evidence contained in a claimant's case record or to explain the weight given to "other sources," the ALJ must ensure that the record includes a sufficient discussion of the evidence in order to allow a reviewing court to trace the ALJ's reasoning and find it supported by substantial evidence when the opinion may have an effect on the outcome of the case. *See* SSR 06-03p, 2006 WL 2329939, at *6 (Westlaw 2014); *McClanahan*, 474 F.3d at 832-33.

On June 15, 2012, the date on which Ms. Molzon rendered her most recent opinion, the record includes treatment notes detailing six occasions on which Plaintiff met with Ms. Molzon, professionally (Docket No. 12, pp. 568-571; 574-575; 580-585 of 585). On March 31, 2012, Ms. Molzon's treatment records indicate that Plaintiff needed transportation to the furniture bank and help selecting furniture due to the anxiety she experiences in public situations (Docket No. 12, pp. 584-585 of 585). Notes from Plaintiff's other sessions with Ms. Molzon reflect that Plaintiff needed assistance completing paperwork for Social Security and housing benefits on multiple occasions (Docket No. 12, pp. 580-583; 568-571 of 585). On June 14, 2012, Ms. Molzon's described Plaintiff as disheveled in appearance, having slowed activity, and being withdrawn among other observations (Docket No. 12, pp. 570-571

18

of 585).  The Mental/Emotional Questionnaire completed by Ms. Molzon on June 15, 2012, includes her observations of Plaintiff's symptoms, fear, panic attacks, and assessment that Plaintiff has marked limitations in her activities of daily living, social functioning, and interaction with the general public (Docket No. 12, pp. 319-320 of 585).  Given the length and frequency of Ms. Molzon's professional relationship, it is clear that Ms. Molzon's opinions and treatment notes were relevant to the ALJ's RFC assessment and the ALJ should have included some explanation in his decision to enable this Court to determine whether Ms. Molzon's opinions were properly considered and weighed. *See* 20 C.F.R. §§ 416.945(a)(3), 416.912(b) (West 2014)*;  Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378-79 (6th Cir. 2013)(holding that a therapist's complete absence from the ALJ's evaluation of the record should have been explained since the therapist's treatment notes were relevant.); *see also Davila*, 993 F.Supp.2d at 758 (reversing and remanding the case for further discussion and explanation of the weight assigned to the opinions of two of the claimant's nurse practitioners); *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 822 (2009 N.D. Ohio)(reversing and remanding, in part, because the ALJ failed to provide some explanation of the weight given to an opinion rendered by the claimant's social worker, which was consistent with those of the claimant's treating psychologist).

Since the undersigned Magistrate is unable to discern from the ALJ's decision whether all of the relevant evidence was properly considered and weighed, the Court cannot find the Commissioner's RFC assessment supported by substantial evidence.  Where an ALJ fails to follow agency rules and regulations, the Sixth Circuit has recognized that such a failure "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011)(*quoting Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)(internal quotation marks omitted)).

## VIII. CONCLUSION

For the foregoing reasons, the Magistrate reverses the Commissioner's decision and remands this case, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Opinion.  On remand, the Commissioner should provide an adequate discussion of Ms. Molzon's treatment notes and opinions, which will enable this Court to determine whether the Commissioner properly considered all of the relevant evidence and rendered a RFC that is supported by substantial evidence.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: January 21, 2015